**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-4033**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

SAUL CAVILLO-ROJAS, a/k/a Saul Rojas, a/k/a Toche,

        Defendant - Appellant.

**No. 10-4061**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

GENARO LARA-SALGADO,

        Defendant - Appellant.

**No. 10-4062**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

ADOLFO JAIMES-CRUZ,

          Defendant - Appellant.

---

**No. 10-4067**

---

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

      v.

FREDY JAIMES-CRUZ,

          Defendant - Appellant.

---

**No. 10-4072**

---

UNITED STATES OF AMERICA,

          Plaintiff - Appellee,

      v.

LORENZO JAIMES-CRUZ,

          Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington. Louise W. Flanagan, District Judge. (7:08-cr-00139-FL-4; 7:08-cr-00139-FL-5; 7:08-cr-00139-FL-3; 7:08-cr-00139-FL-2; 7:08-cr-00139-FL-1)

---

Argued: September 21, 2012      Decided: February 15, 2013

---

Before TRAXLER, Chief Judge, and NIEMEYER and MOTZ, Circuit Judges.

———————

Affirmed in part, reversed in part, and remanded in part by unpublished opinion. Judge Niemeyer wrote the opinion, in which Chief Judge Traxler and Judge Motz joined.

———————

**ARGUED:** Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina; Jorgelina E. Araneda, ARANEDA LAW FIRM, Raleigh, North Carolina; Mitchell G. Styers, BANZET, THOMPSON & STYERS, PLLC, Warrenton, North Carolina; Slade Culli Trabucco, THE TRABUCCO LAW FIRM, PA, Raleigh, North Carolina; Seth Allen Neyhart, STARK LAW GROUP, PLLC, Chapel Hill, North Carolina, for Appellants. Jennifer P. May-Parker, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Kristine L. Fritz, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

Saul Cavillo-Rojas, Genaro Lara-Salgado, Adolfo Jaimes-Cruz, Fredy Jaimes-Cruz, and Lorenzo Jaimes-Cruz were convicted of participating in a large-scale cocaine trafficking conspiracy based in Hallsboro, North Carolina, and related offenses. On appeal, all of the defendants, except for Lorenzo Jaimes-Cruz, challenge the sufficiency of the evidence used to convict them. Various defendants also assign error to the district court's denial of several pretrial motions, as well as three of its evidentiary rulings, and Cavillo-Rojas challenges the reasonableness of his sentence.

We conclude that the government failed to present evidence sufficient for the jury to convict Lara-Salgado and accordingly vacate his convictions on Counts One, Three, Four, Fourteen, and Fifteen. We also conclude that Count Eleven, charging Fredy Jaimes-Cruz with illegal entry into the United States, was barred by the applicable statute of limitations and accordingly vacate his conviction on that count and remand for resentencing. We reject the remaining arguments of the defendants and affirm their convictions. And we affirm Cavillo-Rojas's sentence.

I

In May 2007, after officers with the Sherriff's Office in New Hanover County, North Carolina, searched the home of Ronald

4

Darden and recovered crack and powder cocaine, Darden agreed to cooperate with police and participate in a controlled drug buy from Lorenzo Jaimes-Cruz, whom he knew as "Amigo." Darden had started regularly buying cocaine from Lorenzo through an intermediary about two years before and had been buying directly from him since late 2006 or early 2007. Under their usual arrangement, Darden would call Lorenzo every two to three weeks to set up a purchase, and Lorenzo or another individual would deliver the cocaine to him at a pre-arranged location picked by Lorenzo. On March 18, 2008, under police supervision, Darden placed this type of call to Lorenzo, who agreed to sell Darden one kilogram of cocaine for $24,000.

Two days later, on March 20, Darden, fitted with a body wire and under police surveillance, drove to the pre-arranged location on a back road to consummate the transaction, where he was met by a man later identified as Saul Cavillo-Rojas. Saul Cavillo-Rojas handed Darden a kilogram of cocaine and took a "dummy roll" of currency made to look like $24,000. When Darden asked what the price would be for two kilograms of cocaine, Cavillo-Rojas responded that he would get back to him. Shortly after the exchange, police stopped and arrested Cavillo-Rojas, finding the money in a hidden compartment of the truck he was driving. As the police were interviewing Cavillo-Rojas in a patrol car, a burgundy Dodge Durango pulled up to the scene,

driven by Juan Carlos Mendoza, with Lorenzo Jaimes-Cruz sitting in the front seat and Genaro Lara-Salgado, Adolfo Jaimes-Cruz, and Fredy Jaimes-Cruz sitting in the back seat. After Mendoza provided police with a statement, giving them information about the larger drug operation, the police went to secure Lorenzo's home, which was a trailer at 52 Charles Lane in Hallsboro, North Carolina, as well as a nearby trailer located at 18 Roberts Lane, while they obtained search warrants. After receiving warrants and conducting searches, the police recovered several firearms from Lorenzo's home. And from 18 Roberts Lane, they recovered 7.564 kilograms of cocaine and items used for packaging cocaine, including a press, cutting agents, axle grease, plastic wrap, plastic baggies, a set of digital scales, and a razor blade. They also recovered a semi-automatic handgun and ammunition, which had been lying on a couch; an SKS assault rifle, which had been in an open closet with the bulk of the cocaine; and a .357 caliber revolver and a box of ammunition, which had been lying on a bed.

Based on this evidence, a grand jury returned a 16-count indictment against Saul Cavillo-Rojas, Genaro Lara-Salgado, Adolfo Jaimes-Cruz, Fredy Jaimes-Cruz, and Lorenzo Jaimes-Cruz. The indictment charged all five defendants with: (1) conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C.

6

§§ 841(a)(1) & 846 (Count One); (2) possessing with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Three); (3) possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Four); and (4) maintaining a place for the purpose of distributing cocaine, in violation of 21 U.S.C. § 856(a)(1) (Count Fifteen).  Each defendant was also charged with entering the United States at a place other than as designated by immigration officers and eluding examination and inspection by immigration officers, in violation of 8 U.S.C. § 1325(a), and with being an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5) & 924 (Counts Five through Fourteen).  Additionally, Cavillo-Rojas and Lorenzo Jaimes-Cruz were charged in Count Two with distributing 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1), and Lorenzo Jaimes-Cruz was charged in Count Sixteen with making a building available for storing and distributing cocaine, in violation of 18 U.S.C. § 856(a)(2).  All defendants, except for Fredy Jaimes-Cruz, pleaded guilty to the illegal-entry offense, as charged in Counts Five, Seven, Nine, and Thirteen.  Additionally, Cavillo-Rojas pleaded guilty to Count Two.  The defendants were jointly tried before a jury on the remaining counts.

7

At trial, the government introduced testimony from Ronald Darden, as well as from a number of law enforcement officers who testified about the controlled buy in which Darden participated and the searches of the trailers at 52 Charles Lane and 18 Roberts Lane.

The government also presented testimony from Mendoza, the driver of the Dodge Durango, who had pleaded guilty to a drug conspiracy charge. Mendoza testified that his sister was married to Lorenzo and that he had come to North Carolina to live with them in December 2007. A couple of weeks after he arrived, he agreed, as a favor to Lorenzo, to put the trailer at 18 Roberts Lane in his name, even though Lorenzo paid for the trailer and for the utility bills. He testified that Adolfo Jaimes-Cruz and Saul Cavillo-Rojas lived at the trailer, but that he, Lorenzo, and Fredy Jaimes-Cruz also spent time there. According to Mendoza, for a two month period, ten kilograms of cocaine were delivered to the trailer every two to three weeks, and he, Lorenzo, and Fredy would then repackage it, about two kilograms at a time. He described how they would use a hammer and a knife to cut the cocaine into pieces, which they then mixed with cutting agents, compressed, and wrapped with plastic baggies and tape. Mendoza testified that he was the one who usually purchased the supplies used for repackaging, although Cavillo-Rojas once purchased tape and baggies. He said that

8

Cavillo-Rojas and Adolfo also took some of the cocaine for personal use.

Mendoza also testified that on the day of their arrest, March 20, 2008, he, Lorenzo, Fredy, Adolfo, and Lara-Salgado were in the burgundy Dodge Durango on their way to eat at a restaurant in Wilmington when Lorenzo directed Mendoza, who was driving, to turn off their route and drive to a certain place, saying that he wanted to see if Cavillo-Rojas was all right.

The government also called Agent Thomas Swivel of Immigration and Customs Enforcement to testify about statements made by Genaro Lara-Salgado during a police interview on April 30, 2008. Before Swivel testified, the district judge instructed the jury "that any statement should not be considered in any way whatsoever as evidence with respect to any other defendant on trial." Swivel then testified that Lara-Salgado had told him that he had been living at the 18 Roberts Lane trailer for about 15 days and that he received room and board for taking care of roosters and chickens that were close to the property. Swivel stated that Lara-Salgado told him that the trailer was a stash house and that he had seen the packaging, repackaging, and transportation of cocaine there, witnessing the presence of at least four kilograms of cocaine, but that he had denied any direct involvement. Swivel testified also that Lara-Saldago told him that he was given cocaine for personal use by

9

another person who resided in the trailer, who would "pinch a quantity off" of a kilogram of cocaine.

At the conclusion of the evidence, the jury returned guilty verdicts on all charges. The district court sentenced Saul Cavillo-Rojas to 248 months' imprisonment; Genaro Lara-Salgado to 180 months' imprisonment; Adolfo Jaimes-Cruz to 248 months' imprisonment; Fredy Jaimes-Cruz to 270 months' imprisonment; and Lorenzo Jaimes-Cruz to 425 months' imprisonment. Each defendant was also sentenced to a five-year term of supervised release and ordered to pay a fine.

These appeals followed.

II

First, Saul Cavillo-Rojas, Adolfo Jaimes-Cruz, Fredy Jaimes-Cruz, and Genaro Lara-Salgado contend that the evidence was insufficient to convict them as to the counts charging them with (1) conspiring to distribute and possess with intent to distribute five kilograms or more of cocaine (Count One); (2) possessing with intent to distribute five kilograms or more of cocaine (Count Three); (3) possessing a firearm in furtherance of a drug trafficking crime (Count Four); (4) being an illegal alien in possession of a firearm (Counts Eight, Ten, Twelve, and Fourteen); and (5) maintaining a place for the purpose of distributing cocaine (Count Fifteen).

10

A challenge to the sufficiency of evidence must fail if "there is substantial evidence, taking the view most favorable to the Government, to support [the conviction]." United States v. Moye, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (internal quotation marks omitted). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). In reviewing a sufficiency claim, we consider "circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982).

The elements of the crimes for which these four defendants challenge their convictions are well established. First, to prove the charged conspiracy, "the government was required to establish beyond a reasonable doubt that: (1) an agreement to distribute and possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy." United States v. Yearwood, 518 F.3d 220, 225-26 (4th Cir. 2008) (internal quotation marks omitted). "The existence of a tacit or mutual understanding is sufficient to establish a conspiratorial agreement, and the

11

proof of an agreement need not be direct -- it may be inferred from circumstantial evidence." United States v. Kellam, 568 F.3d 125, 139 (4th Cir. 2009) (internal quotation marks omitted); see also United States v. Edmonds, 700 F.3d 146, 147 (4th Cir. 2012) (reissuing earlier opinion at 679 F.3d 169, 174 as to its holding that a conspiracy can be inferred from the quantity of cocaine involved in a transaction between two persons). Additionally, "[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Burgos, 94 F.3d at 861 (internal quotation marks omitted). In other words, "a defendant need not know all of his coconspirators, comprehend the reach of the conspiracy, participate in all the enterprises of the conspiracy, or have joined the conspiracy from its inception." Id.

Second, to prove the charge of possession with intent to distribute cocaine, the government must show: (1) possession of the cocaine; (2) knowledge of this possession; and (3) intent to distribute the cocaine. See Burgos, 94 F.3d at 873. Possession may be actual or constructive, and constructive possession may be proved by showing "that the defendant exercised, or had the power to exercise, dominion and control over the item." Id. (internal quotation marks omitted). Additionally, "[p]ossession need not be exclusive, but may be shared with others." Id.

12

(alteration in original) (internal quotation marks omitted). "The requisite intent to distribute may be inferred if the quantity of drugs is greater than would be used for personal consumption." Id. As such, "[m]ultiple persons possessing a large quantity of drugs and working in concert sufficiently establish constructive possession." Burgos, 94 F.3d at 873.

Third, "[t]o establish a violation of 18 U.S.C. § 924(c)(1), the government must prove that the defendant used or carried a firearm during and in relation to a drug trafficking crime or possessed a firearm in furtherance of a drug trafficking crime." United States v. Stephens, 482 F.3d 669, 673 (4th Cir. 2007). We have held that the statutory term "furtherance" in § 924(c) "should be given its plain meaning," and we have recognized that one of the ways a firearm might further drug trafficking is by "provid[ing] a defense against someone trying to steal drugs or drug profits" or by "lessen[ing] the chance that a robbery would even be attempted." United States v. Lomax, 293 F.3d 701, 705 (4th Cir. 2002).

Fourth, to establish a § 922(g)(5)(A) violation, the government must prove: (1) that the defendant was an alien illegally in the United States; (2) that he knowingly possessed a firearm; and (3) that the firearm had travelled in interstate commerce. See United States v. Smoot, 690 F.3d 215, 218 n.2 (4th Cir. 2012).

13

Fifth and finally, to prove the offense of maintaining premises for drug activity, the government must prove that the defendant (1) knowingly (2) opened, leased, rented, used, or maintained a place (3) for the purpose of manufacturing, distributing, or using a controlled substance. 21 U.S.C. § 856(a)(1).

In this case, the government presented ample evidence to support the convictions of Saul Cavillo-Rojas, Adolfo Jaimes-Cruz, and Fredy Jaimes-Cruz on all five of these offenses. Mendoza testified that Cavillo-Rojas and Adolfo lived at 18 Roberts Lane, a trailer that was used to repackage and store large quantities of cocaine over a two-month period, and that Fredy Jaimes-Cruz spent time there as well as one of three people who actively participated in repackaging the cocaine. From this evidence, the jury could have reasonably found that these defendants knowingly and voluntarily participated in the charged drug-trafficking conspiracy and that they jointly possessed the drugs and guns found in plain view there. Additionally, given the amount of cocaine recovered from 18 Roberts Lane, the evidence that the drugs were repackaged at the trailer for distribution, and the proximity of the guns to the drugs, there was substantial evidence for the jury to find that the guns recovered from the trailer were jointly possessed by these defendants in furtherance of a drug trafficking crime and

14

that they used and maintained the trailer for the distribution of cocaine. Accordingly, we reject the sufficiency challenges raised by these three defendants.

The government's evidence against Genaro Lara-Salgado, however, stands on different footing, and we find merit in his challenge to the sufficiency of the evidence used to convict him. When the defendants moved for acquittal under Federal Rule of Criminal Procedure 29 at the close of the government's case, the district court reserved judgment on Lara-Salgado's motion, later denying it but characterizing the government's proof as "especially limited." In denying the motion, the court relied on the evidence introduced through the testimony of Agent Swivel that Lara-Salgado had admitted to Swivel that he lived at 18 Roberts Lane for 15 days and obtained cocaine for his personal use there. Swivel's evidence was the only evidence in the record tending to inculpate Lara-Salgado, albeit circumstantially.

Lara-Salgado argues persuasively that his admission or confession made to Swivel was not sufficiently corroborated to support its probative value. It is well established that "a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused made after commission of a crime." United States v. Abu Ali, 528 F.3d 210, 234 (4th Cir. 2008) (internal quotation marks omitted). In Opper v. United

15

States, 348 U.S. 84, 93 (1954), the Supreme Court held that corroborative evidence is sufficient if it "supports the essential facts admitted sufficiently to justify a jury inference of their truth." See also Wong Sun v. United States, 371 U.S. 471, 489 (1963) ("[A]lthough corroboration is necessary for all elements of the offense established by admissions alone, extrinsic proof [i]s sufficient which merely fortifies the truth of the confession, without independently establishing the crime charged" (internal quotation marks omitted)). Construing Opper, we have similarly held that "corroborating evidence need not, itself, establish every element of the offense" but that it must at least "tend to support the admitted fact." Stephens, 482 F.3d at 672 (internal quotation marks omitted).

Here, other than Agent Swivel's testimony regarding Lara-Salgado's statement, the government's only evidence against Lara-Salgado was that he was present in the burgundy Dodge Durango, along with Mendoza, Lorenzo Jaimes-Cruz, Adolfo Jaimes-Cruz, and Fredy Jaimes-Cruz, when that vehicle pulled up to the area where police had arrested Cavillo-Rojas shortly after the controlled buy. Without more, however, this evidence does not suffice to corroborate Lara-Salgado's admission that he had been living at 18 Roberts Lane for approximately two weeks. The government's evidence against Lara-Salgado would have been significantly stronger, if not sufficient, if the government had

16

been able to present evidence that the occupants of the Dodge Durango had gotten into the vehicle for the purpose of checking on Cavillo-Rojas, who had yet to return from delivering the kilogram of cocaine involved in the controlled buy. Instead, Mendoza, the government's key witness, testified that the group was in the truck to go to a restaurant in Wilmington for dinner. While en route, he said, Lorenzo unilaterally told him to turn off the route because he wanted to see if Cavillo-Rojas was all right. In light of this testimony, Lara-Salgado's presence in the Dodge Durango's back seat shows that he had some association with the members of the conspiracy, but it does not support a conclusion that his association was knowingly related to drug trafficking, nor does it support his admission about being present at 18 Roberts Lane and receiving cocaine there. The only testimony in the record was that the association of the five defendants in the truck was to go to dinner. Accordingly, we vacate his jury convictions.

III

Various defendants also challenge the district court's denial of four pretrial motions: (1) the defendants' joint motion to bifurcate the trial; (2) Lorenzo Jaimes-Cruz's motion to continue the trial; (3) Lorenzo's motion to suppress evidence obtained during the search of his home; and (4) Fredy Jaimes-

17

Cruz's motion to dismiss Counts Eleven and Twelve of the indictment. We conclude that Count Eleven should have been dismissed as barred by the applicable statute of limitations and that the district court committed no reversible error in denying the other motions.

A

First, Cavillo-Rojas argues directly -- and the other defendants by adoption -- that the district court abused its discretion when it denied their motion to bifurcate the trial in a way that would prevent the jury from receiving evidence regarding their status as illegal aliens when considering the drug-related charges. Specifically, prior to trial, the defendants requested that the district court exercise its discretion under Federal Rule of Criminal Procedure 14(a) to allow a bifurcated trial in which the government would not introduce evidence concerning the defendants' immigration status until after the jury had first considered and rendered a verdict on the drug-related charges. In support of their motion, the defendants expressed concern that evidence of their immigration status could potentially prejudice the jury against them, denying them a fair trial on their drug-related offenses.

The district court denied the motion, noting that a defendant seeking relief under Rule 14(a) "'has the burden of demonstrating a strong showing of prejudice,'" (quoting United

18

States v. Goldman, 750 F.2d 1221, 1225 (4th Cir. 1984)), and concluding that "[d]efendants' general assertion that immigration is a 'highly-charged and highly-emotional' issue does not" suffice. The court further found that conducting a bifurcated trial would result in inefficiencies, especially since the indictment charged crimes involving the possession of guns in relation to both drug trafficking and their status as illegal aliens. The court's ruling was sound and well within its discretion. See United States v. Lopez, 477 F.3d 1110, 1116 (9th Cir. 2007) ("No law supports Lopez's contention that the jury's knowledge that he was an illegal alien created prejudice of such magnitude that the defendant's right to a fair trial [was] abridged" (alteration in original) (internal quotation marks omitted)).

                                B

    Lorenzo Jaimes-Cruz's contention that the district court abused its discretion in denying his motion to continue the trial similarly lacks merit. At the defendants' arraignment on June 9, 2009, the district court noted that it had set the case for trial on August 6, 2009, and gave each defendant, through counsel, "the chance to express any comments about that trial date." When specifically asked by the court whether there were any "compelling issues as to why this case shouldn't go forward

                                19

against Lorenzo Jaimes-Cruz beginning on August 6th," Lorenzo's lawyer at the time, Ms. Darrow, answered, "No, your Honor."

One week later, on June 16, 2009, Lorenzo's newly retained counsel, Ms. Nardine Guirguis, filed a notice of appearance. Over a month later, on July 28, 2009, Ms. Guirguis moved for a continuance on the ground that she "need[ed] additional time to further review the evidence with the defendant in order to best advise and consult with him, and to properly defend his case." The government did not object. The next day, the court denied the motion on the ground that it did "not find good cause exists to further continue this matter."

The district court acted well within its discretion in this ruling. In Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (internal quotation marks omitted), the Supreme Court noted that "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." The Court further explained that trial courts must be granted broad discretion on matters of continuances due to the challenge of "assembling the witnesses, lawyers, and jurors at the same place at the same time." Id. This burden, the Court stated, "counsels against continuances except for compelling reasons." Id.

Here, given that Lorenzo's counsel filed her notice of appearance at least six weeks before the trial commenced, her

20

motion for a continuance on the ground that she simply needed more time to prepare did not present a compelling reason that required the court to find a new block of time at which the witnesses and lawyers for this five-defendant case could appear.

C

Next, Lorenzo appeals the district court's denial of his motion to suppress evidence recovered during a search of his home at 52 Charles Avenue, contending that his Fourth Amendment rights were violated because the police entered his home before obtaining a warrant and also because the warrant they eventually obtained was not supported by probable cause.

At a suppression hearing, Lieutenant Detective Steven Worthington, of the Columbus County Sheriff's Office, testified that during the arrests that followed the controlled buy, he learned of Mendoza's statement made to a Spanish-speaking police officer that Lorenzo Jaimes-Cruz owned both vehicles at the scene; that Lorenzo was the leader of a drug-distribution organization; and that Lorenzo lived at 52 Charles Avenue. Mendoza also stated that there were two firearms inside the residence and that a woman and two small children lived there and were possibly home at the time. At that point, Detective Worthington and a colleague directed an officer who was conducting surveillance of the trailer park to proceed with a SWAT team to secure 52 Charles Avenue while a search warrant was

21

being obtained. Worthington testified that he was concerned that the occupants of the Dodge Durango might have taken the opportunity to make a phone call to alert someone at the mobile home park after they saw that Cavillo-Rojas had been arrested but before they themselves were stopped. Worthington further testified, "Knowing that there was firearms possibly present there, I felt that it was an officer safety issue as much as an issue of destruction of the property that could have been inside." He explained:

> The officers would have been on the outside of the residence conducting . . . perimeter security, without making entry into the residence to secure any other unknown individuals that could have been there. Based on what Mr. Mendoza had told at the traffic stop, he thought there was two small children and a female there. But he had a period of time where he didn't know who else may have been in the residence or any additional property that could have been in the residence, like more firearms.

When the SWAT team entered the residence, they indeed found a woman and two small children present, as well as a long gun and a handgun in plain view. But they did not search the home until they had received the search warrant.

As to the search warrant, the affidavit attached to the application for the warrant showed that the Superior Court judge, who authorized the warrant, had reliable evidence before him that Lorenzo was the leader of a drug-trafficking

22

organization and that his residence contained at least two firearms.

After hearing arguments, the district court denied Lorenzo's motion to suppress, finding "that the agents were well within the exigent circumstances exception to the Fourth Amendment when they entered the defendant's home." The court also found that there was sufficient probable cause to justify the search warrant for 52 Charles Avenue.

We agree. In the circumstances testified to by Worthington, exigent circumstances justified the officers' entry into 52 Charles Avenue to secure the home while they were obtaining a search warrant. See United States v. Cephas, 254 F.3d 488, 495 (4th Cir. 2001) (noting that the factors justifying a warrantless entry based on exigent circumstances include "information indicating the possessors of the contraband are aware that the police are on their trail," "the ready destructibility of the contraband," and "the possibility of danger to police guarding the site" (internal quotation marks omitted)). And the evidence before the Superior Court judge was sufficient to justify his conclusion that probable cause for the warrant existed. He had evidence that Lorenzo was the head of a drug-trafficking operation and that his house contained guns, which were contraband. Accordingly, we conclude that the district court properly denied Lorenzo's motion to suppress.

23

D

Fredy Jaimes-Cruz challenges the district court's denial of his motion to dismiss Count Eleven, which charged him with illegally entering the United States, in violation of 8 U.S.C. § 1325(a), and Count Twelve, which charged him with being an illegal alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). We sustain his challenge and reverse his conviction on Count Eleven; we affirm his conviction on Count Twelve.

In his motion to dismiss Count Eleven, Fredy argued that the § 1325(a) charge, first filed in December 2008, was barred by the five-year statute of limitations set forth in 18 U.S.C. § 3282(a).[1] As relevant here, § 1325(a) makes it a crime to "(1) <u>enter</u>[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers, or (2) elude[] examination or inspection by immigration officers." 8 U.S.C. § 1325(a) (emphasis added). While Fredy concedes that he entered the United States without inspection, he contends that he did so more than five years before he was charged with illegal entry. The record evidence supports his claim. Exhibit

---

[1] Section 3282(a) provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."

FJC-2, admitted into evidence, was an I-797 form ("Notice of Action"), dated June 21, 2006, which reported the approval by the U.S. Citizenship and Immigration Service of an I-130 "Immigrant Petition for Relative" that had been filed on April 23, 2001, by Fredy's father on behalf of Fredy, who was then under 21. The I-797 notice states that the I-130 "petition indicates that the person for whom you are petitioning [i.e., Fredy] is in the United States and will apply for adjustment of status" by filing a form I-485 ("Application for Permanent Residence"). Because this evidence demonstrates that Fredy was in the United States more than five years before he was charged with illegal entry, the illegal-entry charge was barred by the applicable statute of limitations.[2]

The government argues that the evidence failed to show that federal immigration officials "found" Fredy in the United States prior to the five-year period before his indictment, suggesting that the government must have learned of his presence in the

---

[2] The fact that Fredy's illegal entry occurred more than five years before the indictment's return was also indicated subsequently by the pre-sentence investigation report. While the report was not before the district court when it ruled on Fredy's motions, the report nonetheless states that Fredy told the Probation Officer that he first illegally entered the United States in 1996; that he returned to Mexico for three months in 1999; and that he had lived in North Carolina since returning to the United States in 2000. Additionally, the report shows that Fredy was arrested in North Carolina for a traffic offense on March 15, 2002, a date more than five years before the indictment.

United States before the limitations period could begin to run. While the timing of when a defendant is "found" in the United States by federal immigration authorities is material for calculating the limitations period for a violation of 8 U.S.C. § 1326 (making it a crime for an alien who has previously been denied admission or removed to subsequently enter, attempt to enter, or "at any time [be] found in[] the United States"), § 1325(a) contains no similar "found in" element. Instead, a § 1325(a) offense is completed at the time of the defendant's illegal entry, and the statute of limitations begins running at that point. See United States v. Rincon-Jimenez, 595 F.2d 1192, 1194 (9th Cir. 1979).

Because Fredy illegally entered the United States more than five years before he was charged with doing so, we conclude that Count Eleven was barred by the statute of limitations. Accordingly, we vacate his conviction on that charge and remand for resentencing.

As to the district court's failure to dismiss Count Twelve, charging Fredy with being an illegal alien who possessed a firearm, in violation of 18 U.S.C. § 922(g)(5), Fredy raises three challenges. First, he contends that he was not in the United States illegally at the time of his arrest because he had applied to adjust his status from "unlawful" to "lawful" by filing form I-485 and Supplement A in 2007 and had obtained an

26

employment authorization card based on that application. But it is clear, as a number of other circuits have found, that the mere filing of an application for adjustment of status and receipt of an employment authorization card does not legalize the alien's presence in the United States, and it is still a crime, under § 922(g)(5), for that individual to possess a firearm. See United States v. Ochoa-Colchado, 521 F.3d 1292, 1298 (10th Cir. 2008) ("We conclude that Defendant, despite his filing of an application for adjustment of status and receipt of an [employment authorization document], was still 'illegally or unlawfully in the United States' for purposes of § 922(g)(5)(A)"); United States v. Latu, 479 F.3d 1153, 1159 (9th Cir. 2007); United States v. Elrawy, 448 F.3d 309, 314 (5th Cir. 2006) ("[A]n alien who has acquired unlawful or illegal status . . . cannot relinquish that illegal status until his application for adjustment of status is approved"); United States v. Bazargan, 992 F.2d 844 (8th Cir. 1993).

Second, Fredy argues that even if he was not lawfully present by virtue of having filed an application to adjust his status, his legal status was sufficiently unclear as to make § 922(g)(5) unconstitutionally vague as applied to him. This contention also fails. "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for no

27

man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." Buckley v. Valeo, 424 U.S. 1, 77 (1976) (per curiam) (internal quotation marks omitted). Thus, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." United States v. Mazurie, 419 U.S. 544, 550 (1975).

We conclude Fredy had constitutionally adequate notice. His very act of applying for an adjustment of status demonstrates that he had notice of his unlawful status. And a reasonable person of ordinary intelligence would understand that his status had not, in fact, been adjusted until the United States granted his application. We therefore find no merit to Fredy's void-for-vagueness challenge to his § 922(g)(5) conviction.

Finally, Fredy challenges his § 922(g)(5) conviction as violating his Second Amendment rights. Recently, however, we rejected this very argument. See United States v. Carpio-Leon, 701 F.3d 974 (4th Cir. 2012).

28

We conclude that the district court properly denied Fredy Jaimes-Cruz's motion to dismiss Count Twelve.

IV

The defendants also challenge three evidentiary rulings, contending (1) that the admission of Agent Swivel's testimony regarding Lara-Salgado's statements violated the other defendants' rights under the Confrontation Clause; (2) that the district court abused its discretion in its rulings regarding Darden's testimony; and (3) that the district court abused its discretion when it allowed the government to refresh Mendoza's recollection with an earlier statement he had given. We address these in order.

A

All of the defendants, except for Lara-Salgado, raise a Confrontation Clause challenge to the admission of Agent Swivel's testimony regarding the out-of-court statements that Lara-Salgado had made to Swivel. As we have already noted in some detail, Agent Swivel testified at trial that Lara-Salgado stated during an interview that he had been living at the 18 Roberts Lane trailer for about 15 days; that he had seen the packaging, repackaging, and transportation of at least four kilograms of cocaine there; and that he was given cocaine for personal use by another person who resided in the trailer who

29

would pinch a quantity off of a kilogram of cocaine. The defendants argue that because Lara-Salgado did not testify, their rights under the Confrontation Clause were violated by the admission of this testimony, even though the district court instructed the jury that this evidence "should not be considered in any way whatsoever as evidence with respect to any other defendant."

In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." Richardson v. Marsh, 481 U.S. 200, 207 (1987). In Richardson, however, the Court made clear that Bruton's rule was a narrow one, explaining that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211. The fact that the defendant "is nonetheless linked to the confession by evidence properly admitted against him at trial," the Court found, did not result in a Confrontation Clause violation. Id. at 202. The Court again considered the application of the Confrontation Clause to

30

a nontestifying codefendant's confession in Gray v. Maryland, 523 U.S. 185, 188 (1998), holding that the prosecution could not redact the codefendant's confession by substituting for the defendant's name a blank space or the word "deleted" because such redactions would make it obvious to the jury that the defendant's name had been deleted.

From this line of cases, we have concluded that statements that "obviously identify the defendant, even without naming him, effect a constitutional violation that cannot be cured by a jury instruction." United States v. Lighty, 616 F.3d 321, 376 (4th Cir. 2010). By contrast, "statements that incriminate by inference or only when linked with later evidence" do not violate the Sixth Amendment if accompanied by a proper limiting jury instruction. Id. at 376-77.

Agent Swivel's testimony regarding Lara-Salgado's statement does not obviously identify any other defendant, and it became incriminating as to other defendants only when linked with other evidence -- namely, evidence that established the other defendants' connection to 18 Roberts Lane. Because the jury was properly instructed that it could not use Lara-Salgado's statement against the other defendants, we conclude that the defendants' rights under the Confrontation Clause were not violated.

31

Lorenzo Jaimes-Cruz also contends that the district court abused its discretion in denying a motion to strike Darden's testimony or, in the alternative, in refusing to allow testimony of Darden's misidentification or to sever the trial. This challenge arises from a development that occurred on the second day of trial.

Specifically, when Ronald Darden was interviewed by police after the March 20, 2008 controlled buy, he indicated that he had never before seen the person who had delivered the cocaine to him, and he repeated this statement during a subsequent interview. During a later interview, however, he was shown a photograph of Adolfo Jaimes-Cruz, and a note was written on the margin that Darden "thought it might be the guy who brought the cocaine."

Prior to trial, Adolfo moved to suppress any identification of him by Darden. When the government represented that it did not intend to offer the identification at issue, the court denied Adolfo's motion as moot.

On the morning of the second day of trial, however, government counsel told defendants' counsel that during trial preparation the previous evening, Darden stated (1) that he regularly did drug deals with "Amigo" during the period between when he agreed to become a confidential informant (May 2007) and

32

March 20, 2008, when the controlled buy took place; and (2) that the person who delivered cocaine to him on March 20, 2008, had also delivered cocaine to him a month earlier. Lorenzo's counsel moved to strike Darden as a witness entirely on the ground that it would have changed her trial preparation had she known that Darden had continued to deal drugs after he agreed to become a confidential informant. The court denied that motion.

Additionally, Cavillo-Rojas's counsel indicated that if Darden was going to testify that the person who delivered cocaine to him on March 20, 2008, had previously delivered cocaine to him, then he would want to raise the issue of Darden's earlier identification of Adolfo as the person who brought the cocaine. Counsel for Cavillo-Rojas and Adolfo therefore indicated that a conflict had arisen between their clients. But instead of moving to sever their cases, they indicated that they would be satisfied as long as Darden did not testify that the person who delivered drugs to him on March 20, 2008, had previously done so, and the government agreed not to elicit that testimony.

Lorenzo's counsel then indicated that she wanted to elicit the fact that Darden was engaged in drug transactions while he was an informant but that she wanted to exclude any statement that those drug transactions had been with "Amigo." The government objected to this proposal. Lorenzo's counsel also

33

indicated that she wanted to cross-examine Darden about his "misidentification." She stated that it was her intent "to ask him whether or not he's aware that he misidentified an individual throughout this investigation." The government indicated that it would object to such a question on the basis that Darden's statement regarding Adolfo's picture was not a misidentification.

The court agreed that a note written in the margin of Adolfo's photograph indicating that Darden "thought it might be the guy who brought the cocaine" did not constitute a misidentification and that Lorenzo's counsel could not use it for purposes of impeaching Darden. The court later indicated, however, that Lorenzo's counsel could cross-examine Darden generally about identifications. The court further ruled that if the government wanted to present Darden as a witness, the government had to present him as having breached the confidential source agreement by continuing to engage in the purchase of narcotics. The court also ruled that no one could elicit "who he bought drugs from or any of the specifics of how the drugs he may have bought were delivered to him or who may have delivered them."

On appeal, Lorenzo now argues that the district court abused its discretion "by denying the motion to sever and forbidding defense counsel to elicit on cross examination the

34

fact that Mr. Darden had identified Adolfo as the person who had previously brought him drugs." We do not agree.

First, there was no motion to sever -- counsel for Adolfo and Cavillo-Rojas indicated that they might move to sever but eventually agreed that a severance was not necessary because of the government's agreement not to use Darden's new information. Moreover, it is a stretch for Lorenzo to claim that he was denied an opportunity to cross-examine Darden meaningfully when the supposed misidentification was Darden's own statement, when shown a picture of Adolfo, that he "thought it might be the guy who brought the cocaine." Having been presented with a Gordian knot, the district court worked with counsel to resolve it fairly to all concerned. In fact, it ruled mostly in the defendants' favor, requiring the government to disclose that Darden breached his confidential source agreement but precluding the government from showing that he did so by buying more cocaine from Lorenzo. In short, we conclude that Lorenzo has failed to show that the district court abused its discretion in its rulings regarding Darden's testimony.

C

The defendants also contend that the district court abused its discretion by allowing the government to orchestrate a change in Mendoza's testimony by purporting to refresh his recollection. They point out that Mendoza first testified that

35

he did not know how the cocaine got into the 18 Roberts Lane trailer and that he did nothing with the drugs. At that point, government counsel started to take steps to confront Mendoza with a prior inconsistent statement and, during a sidebar conference, indicated that she would "probably ask the Court to allow me to treat him as a hostile witness, and proceed that way." Government counsel then showed Mendoza his prior statement, which he eventually identified as his own. The court then took a 15-minute recess.

After the break, government counsel continued the examination without referencing the statement. Mendoza then described how he was arrested and interviewed by the police. He eventually testified that Lorenzo put the drugs in the house, and defense counsel did not object that that question had been asked and answered. He also testified that he, Fredy, and Lorenzo repackaged the cocaine, although he stated that he could not remember how it was done. When he indicated that he was unable to remember other details, government counsel returned to asking him about his previous statement. Mendoza testified that he had made the statement, signed it, and that when he signed he was agreeing to what was in the statement. He also acknowledged that on the date that he signed the statement, the events were fresh in his memory; that he was currently having problems remembering; and that seeing the statement would refresh his

36

recollection. Although the court had just given the jury a limiting instruction regarding the use of a prior inconsistent statement to impeach a witness's credibility, government counsel indicated that she was "backing up and changing horses in midstream, so to speak" and instead was asking permission to use Mendoza's statement to refresh his recollection. After Mendoza reviewed the statement, it was taken from him, and he again testified that Lorenzo put the cocaine in the trailer and to further details regarding the repackaging operation. He also testified that he had seen Lorenzo accept a payment for drugs.

The defendants' primary challenge regarding Mendoza's testimony appears to be that the government gave him a copy of his statement and that, when questioning resumed after a 15-minute recess, he materially altered his testimony by stating that Lorenzo put the drugs in the trailer. Defendants argue that only later did the prosecution lay the necessary foundation for using the document to refresh Mendoza's recollection. Thus, defendants contend, "the government was allowed to use testimony that was not actually refreshed recollection, but rather a parrot of the content of an unsworn document."

We are not persuaded that defendants' complaint is any more than one about the inconsistencies of a reluctant witness. Although Mendoza changed his testimony regarding whether he knew how the drugs got in the trailer, the change does not appear to

37

be a result of the government having shown him the statement for identification purposes. To be sure, the district court allowed the government some latitude in repeating certain questions, but we refuse to conclude that this constituted an abuse of discretion.

V

Finally, Cavillo-Rojas argues that his sentence of 248 months' imprisonment is both procedurally and substantively unreasonable. First, he claims that the district court committed a significant procedural error when calculating his Guidelines range by relying on an out-of-court statement by Mendoza when determining the drug quantity that should be attributed to him. He argues that "[p]roperly limiting the drug quantity calculation to the scope of Cavillo-Rojas's 'jointly undertaken criminal activity,' he was at most responsible for the cocaine he delivered, plus the drugs found on the day of his arrest." He asserts that Mendoza's trial testimony was erratic and inconsistent and that the district court therefore erred by relying on a hearsay statement from this unreliable witness.

Yet, as the government correctly notes, a defendant involved in a drug conspiracy is responsible for his own acts, as well as for "all reasonably foreseeable acts . . . of others in furtherance of the jointly undertaken criminal activity."

38

U.S.S.G. § 1B1.3(a)(1)(B). Additionally, a sentencing court is not constrained by the rules of evidence and may consider any relevant information, provided it has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Under these principles, Cavillo-Rojas has not shown that the district court erred by accepting Mendoza's out-of-court statement and attributing more drugs to Cavillo-Rojas than the ones recovered by the police on March 20, 2008.

Cavillo-Rojas also contends that his 248-month sentence is substantively unreasonable in light of the totality of the circumstances. Yet, the district court sentenced Cavillo-Rojas to the low end of the applicable Guidelines' range, and Cavillo-Rojas has failed to rebut the presumption of reasonableness applicable to a within-Guidelines sentence. See Abu Ali, 528 F.3d at 261. Accordingly, we affirm his sentence.

VI

For the reasons given, we conclude that the government failed to present sufficient evidence to convict Lara-Salgado and accordingly vacate his convictions on Counts One, Three, Four, Fourteen, and Fifteen. We conclude that Count Eleven, charging Fredy Jaimes-Cruz with illegal entry into the United States, was barred by the statute of limitations and accordingly vacate his conviction on Count Eleven and remand for

39

resentencing.  As to the remaining counts, we affirm the convictions, and we affirm Cavillo-Rojas's sentence.

<u>AFFIRMED IN PART,</u><br>
<u>REVERSED IN PART,</u><br>
<u>AND REMANDED IN PART</u>