(Slip Opinion)

# Whether Eluding Inspection Under 8 U.S.C. § 1325(a)(2) Is a Continuing Offense

Eluding inspection under 8 U.S.C. § 1325(a)(2) is a continuing offense.

Our Office's prior prudential advice that section 1325(a)(2) should be charged only in the district of entry is withdrawn.

June 21, 2025

MEMORANDUM OPINION FOR THE
DEPUTY ATTORNEY GENERAL

Congress has long prohibited aliens, under pain of criminal sanction, from eluding examination by immigration officers. *See* Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 275, 66 Stat. 163, 229 (codified as amended at 8 U.S.C. § 1325(a)(2)). Whether that prohibition reflects a continuing offense is an important question of statutory interpretation that affects potentially thousands of criminal prosecutions each year. In 1978, in response to a request for guidance from the Criminal Division, this Office issued an opinion (1) finding that if section 1325(a)(2) were not a continuing offense, its venue provision, contained in section 1329 of the same title, would be unconstitutional, and (2) recommending that the Criminal Division avoid that constitutional difficulty by instructing prosecutors to charge section 1325(a)(2) only in the district in which the alien entered the United States and avoided the "inspection station." Your office has asked us to reconsider both aspects of our 1978 advice.

*First*, we do not see grounds—or a need—to revisit our 1978 opinion's core analysis. That opinion did not interpret section 1325(a)(2). Instead, it assumed that section 1325(a)(2) was complete when an alien enters the country without proper inspection and concluded that section 1329 was unconstitutional to the extent that it nonetheless allowed venue in any place where the alien is apprehended. That bounded analysis of section 1329 was correct.

*Second*, we agree that the Criminal Division should rescind its instruction to prosecutors not to charge section 1325(a)(2) outside the district in which an alien entered the country, an instruction that the Department issued in response to the recommendation in our 1978 opinion. Whether a

section 1325(a)(2) offense is continuing is an important issue, and one which has not been conclusively decided by most courts of appeals or the Supreme Court. After additional consideration, we have concluded that it describes a continuing offense for purposes of section 1329's venue provision. We therefore withdraw our prudential recommendation that prosecutors charge section 1325(a)(2) only as a non-continuing offense.

## I.

Section 1325(a) of title 8 of the United States Code criminalizes three actions by an alien. The first is "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." The second is "elud[ing] examination or inspection by immigration officers." And the third is using "a willfully false or misleading representation or the willful concealment of a material fact" in attempting to enter or attaining entry. A first offense for any of these crimes is a misdemeanor for which an alien might be fined or imprisoned up to six months. 8 U.S.C. § 1325(a). Subsequent offenses may result in up to two years in prison. *Id.* Together, these offenses count among the most charged crimes in the federal code. *See* Jessica Zhang & Andrew Patterson, *The Most Prosecuted Federal Offense in America: A Primer on the Criminalization of Border Crossing*, Lawfare (July 25, 2019), https://www. lawfaremedia.org/article/most-prosecuted-federal-offense-america-primer-criminalization-border-crossing. By statute, prosecutors may charge section 1325 violations anywhere they "may occur or" anywhere a defendant charged with one of those crimes was "apprehended." 8 U.S.C. § 1329.

In 1978, the District of Idaho issued an unpublished decision entitled *United States v. Wissel*.[1] We concluded that an "implication" of the court's holding was that section 1325(a)(2) "did not create a continuing offense," but was instead completed when the alien evaded an inspection station at or near his point of entry. *Whether Prosecutions for "Eluding Inspection" Under 8 U.S.C. § 1325 May Be Brought in the District Where the Defendant Is Apprehended*, 2 Op. O.L.C. 110, 110 (1978) ("*Eluding Inspection*"). Taking the district court's implied holding as authoritative, the Criminal Division asked our Office whether it would violate the Constitution to

---

[1] We were unable to obtain a copy of this unpublished opinion, so we have accepted our Office's 1978 characterization of it for purposes of this opinion.

charge section 1325(a)(2) in the district of apprehension, which can be (and often is) far from the district of the offense.

As a matter of practice, our Office typically accepts questions as they are presented to us. And per the Criminal Division's question, we assumed that section 1325(a)(2) was not a continuing crime. From that assumption, we concluded that section 1329's venue rules would violate the constitutional "requirement that prosecutions be undertaken in the district where the crime was committed." *Id.* at 112; *see also id.* at 111 n.3 (explaining that Article III and the Sixth Amendment require prosecution in the State and district where the crime occurred). In other words, if a section 1325(a) crime was non-continuing, the only constitutionally permissible venue would be the district where the alien illegally crossed into the United States.[2] *Id.* at 111–12. Section 1329 would be unconstitutional as applied to a prosecution in any other district.

But we did not stop there. Though we never squarely analyzed whether section 1325(a)(2) was a continuing offense, we nevertheless "recommend[ed]" that the Criminal Division avoid any constitutional issue by instructing that "no future prosecutions under [section] 1325 be instituted except . . . in the district where the inspection station to which the alien was to have reported on entering the United States is located"—in most cases, the district of entry. *Id.* at 112. The Criminal Division followed our advice. Specifically, when addressing "Venue," the Department of Justice's internal manual says that no crime in section 1325(a) is "a continuing legal offense" and that all "must be charged where the defendant entered." *Illegal Entry*, DOJBook (Jan. 22, 2016), https://dojnet.doj.gov /usao/eousa/ole/dojbook/indf/indf874.htm.

The effect of that instruction has been to severely curtail prosecution of aliens who are not immediately apprehended at the border, which has prevented further judicial analysis of whether section 1325(a)(2) describes any continuing offenses. We know of only two courts of appeals to have addressed the issue directly, and only one in published decisions. The Ninth Circuit was faced with the issue because a defendant ostensibly was

---

[2] For simplicity, we refer in this opinion to the district of entry, although our 1978 opinion technically acknowledged that venue would also be permissible "in the district where the inspection station to which the alien was to have reported on entering the United States is located," even if that district was not the district in which the alien entered the country. *Eluding Inspection*, 2 Op. O.L.C. at 112.

indicted before we gave our advice. *United States v. Rincon-Jimenez*, 595 F.2d 1192, 1193 (9th Cir. 1979) (criminal proceeding filed in April 1978). The court "decline[d] to make the offense described in [section 1325(a)(2)] one that continues" based largely on what that panel assessed to be the relevant "judicial and congressional polic[ies]." *Id.* at 1193–94. The Fourth Circuit has concluded, in an unpublished decision, that "a [section] 1325(a) offense is completed at the time of the defendant's illegal entry." *United States v. Cavillo-Rojas*, 510 F. App'x 238, 248 (4th Cir. 2013). That sweeping language notwithstanding, there is reason to doubt that the court's conclusion extends to the eluding-inspection offense in section 1325(a)(2). The government brought a "[section] 1325(a) charge" without distinguishing between illegal entry under section 1325(a)(1) and eluding examination or inspection under section 1325(a)(2). *Id.* One of the defendants made an argument germane to the continuing-offense question, but that argument was explained only in relation to the count "charg[ing] him with illegally entering the United States"—section 1325(a)(1). *Id.* The court's decision focused on the word "enter" in section 1325(a)(1) and juxtaposed that verb with the language in section 1326; it did not separately consider section 1325(a)(2)'s use of the verb "elude." *See id.*

On March 17, 2025, the United States Attorney for the Southern District of Illinois sent you a memorandum seeking approval to bring applicable section 1325(a) charges in that district when the facts establish an unlawful entry into the United States within the statute of limitations. Memorandum for Todd Blanche, Deputy Attorney General, from Steven D. Weinhoeft, United States Attorney, Southern District of Illinois, *Re: Illegal Entry, 8 U.S.C. § 1325(a)* (Mar. 17, 2025). That memorandum asks for reexamination of our 1978 opinion so that federal prosecutors can pursue charges in districts in which illegal aliens have been apprehended. You referred that memorandum to us.

## II.

To start, we see neither the need nor the grounds to revisit our 1978 opinion's limited analysis of section 1329. It is this Office's longstanding view that it "should not lightly depart from . . . past decisions, particularly where they directly address and decide a point in question." Memorandum from David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, to Attorneys of the Office, *Re: Best Practices for OLC Legal*

*Advice and Written Opinions* at 2 (July 16, 2010). That is particularly so when, as here, we need not revisit the point to answer the new question posed.

Our 1978 opinion did not analyze whether section 1325(a)(2) describes a continuing offense. Instead, it accepted as a given the District of Idaho's implied holding that section 1325(a)(2) created a non-continuing offense. Only then did it analyze what that holding, if true, meant for section 1329's venue provision. *Eluding Inspection*, 2 Op. O.L.C. at 110–12. We continue to believe that, if section 1325(a) does not define a continuing offense, the crime was committed where the alien crossed into the country or in the district of the inspection station to which he was required to report upon entering, and nowhere else. *See id.* Prosecuting such a crime anywhere else would violate the Constitution's vicinage requirement that criminal trials take place in "the State and district" in which the "crime shall have been committed." U.S. Const. amend. VI; *see also id.* art. III, § 2 (criminal "Trial[s] shall be held in the State where the said Crimes shall have been committed"). So, if section 1325(a) offenses are non-continuing, Congress cannot constitutionally permit "prosecutions or suits" in a district "at which the person charged with a violation under section 1325 . . . may be apprehended" but where the violation did not "occur." 8 U.S.C. § 1329. The 1978 opinion's constitutional analysis of section 1329 still holds up.

### III.

Nevertheless, we do think it appropriate to reconsider the instruction that the 1978 opinion provided to the Criminal Division based on the opinion's bounded analysis of section 1329. In the past, we have recognized that it can be appropriate to narrow or clarify specific statements or assumptions made in our opinions where they are later found to be on shaky footing or to have caused negative practical implications. This is such a circumstance. Based on our assumption that section 1325(a)(2) "did not create a continuing offense," we recommended that the Criminal Division instruct prosecutors to charge the offense only "where the inspection station to which the alien was to have reported on entering the United States is located." *Eluding Inspection*, 2 Op. O.L.C. at 112. The Criminal Division did so by revising its internal charging guidelines. As a result of those guidelines, prosecutors appear not to have charged section

1325(a)(2) as a continuing offense, which means courts have almost entirely lost the opportunity to adjudicate the question whether section 1325(a)(2) describes such an offense.

Having now analyzed section 1325(a)(2), we conclude that it describes a continuing offense for purposes of venue. And because it is a continuing offense, the Criminal Division instruction limiting where it can be charged should be rescinded. Doing so would free prosecutors to charge the crime as continuing, which would in turn free courts to "check on the correctness" of our interpretation of this important criminal statute. *Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 42 Op. O.L.C. 158, 180 (2018) ("*Wire Act*").

## A.

To understand why section 1325(a)(2) describes a continuing offense, we "[a]s always" "begin with the text." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022). Section 1325(a)(2)'s text says that "[a]ny alien who . . . eludes examination or inspection by immigration officers" will face up to six months in prison for a first offense. 8 U.S.C. § 1325(a). In 1952, at the time of enactment, the word "elude" meant "[t]o avoid slyly or adroitly, as by artifice, stratagem, or dexterity; to evade; . . . [t]o escape the notice or perception of." *Webster's New English Dictionary* 267 (6th ed. 1951) ("*Webster's New*"). In plain English, a person eludes authorities until they are caught, which suggests that the offense continues in the meantime. *See, e.g.*, *United States v. Bailey*, 444 U.S. 394, 399 (1980) (prisoners "eluded the authorities for one month").

Supreme Court precedent buttresses this straightforward reading of the word "elude," which long has been understood to mean much the same as the word "escape." *See Webster's New* at 267; *see also Webster's New International Dictionary* 713 (1st ed. 1930) (defining elude as "escape from in a covert manner").[3] In *United States v. Bailey*—decided two years

---

[3] The definition has not materially changed since. *See, e.g.*, *Webster's New World College Dictionary* 455 (2d ed. 1970) (defining elude to mean "escape detection, notice, or understanding"); *Webster's Third New International Dictionary* 738 (2002) (defining elude to mean, in part, "escape the notice or perception of"); 3 *Oxford English Dictionary First* 97 (defining elude to mean "escape by dexterity or stratagem" or "escape adroitly from"); *accord United States v. Corrales-Vazquez*, 931 F.3d 944, 949 (9th Cir. 2019) ("To elude, in other words, generally contemplates a risk of exposure to, and subsequent escape

after the District of Idaho's decision in *Wissel* and our opinion—the Supreme Court considered whether "escape" from federal custody is a continuing offense. *See* 444 U.S. at 396–97 (citing 18 U.S.C. § 751(a)). The Court found it "clear beyond peradventure that escape from federal custody . . . is a continuing offense and that an escapee can be held liable for failure to return to custody as well as for his initial departure." *Id.* at 413. An alien who eludes examination is like a convict who escapes from federal custody—the act of eluding or escaping extends beyond the initial moment of evasion. Linguistically, both words express an ongoing act.

An argument could be made that a person evades authorities at a specific moment, which might suggest a non-continuing offense. *See, e.g.*, *United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992) (in a tax context, the "offense is complete when a single willful act of evasion has occurred"). *But see United States v. Root*, 585 F.3d 145, 156 (3d Cir. 2009) ("Tax evasion is a continuing offense . . . ." (citing 18 U.S.C. § 3237(a)); *United States v. Barker*, 556 F.3d 682, 689 (8th Cir. 2009) (same). So to confirm the plain meaning of "elude," we look to the remaining language in section 1325(a)(2), and the context in which we find it.

That provision, read as a whole and in context, supports an interpretation of section 1325(a)(2)'s offense as continuing. It criminalizes eluding "examination or inspection by immigration officers." 8 U.S.C. § 1325(a)(2). That language points the reader to section 1225 of the same title, which pertains to (in part) "[i]nspection by immigration officers." *See United States v. Corrales-Vazquez*, 931 F.3d 944, 947 & n.3 (9th Cir. 2019) (noting that the term "inspection" in section 1325(a)(2) "refers to background screening, searches, and other prerequisites for admission" (citing 8 U.S.C. § 1225(a)(3), (d))). Section 1225 details whom immigration officers inspect, and when. If immigration officers have an ongoing duty to inspect illegal aliens, it stands to reason that an illegal alien may continuously elude inspection, even after the specific moment at which he enters the country. On this, section 1225(a) is clear. Any "alien present in the United States who has not been admitted . . . shall be deemed . . . an

---

from, the object being eluded."); *United States v. Oscar*, 496 F.2d 492, 494 (9th Cir. 1974) (defining elude in section 1325(a)(2) as meaning "to avoid or escape" (citation omitted)).

applicant for admission." 8 U.S.C. § 1225(a)(1). And "[a]ll aliens . . . who are applicants for admission . . . shall be inspected by immigration officers." *Id.* § 1225(a)(3). Indeed, the Department of Homeland Security has informed us that, as part of expedited removal questioning, it inspects applicants for admission whenever—and wherever—they are apprehended. And Customs and Border Patrol officials apply expedited removal procedures every day between ports of entry.

Other subsections of section 1225 reinforce this conclusion. Subsection (b)(1), for instance, governs the "[i]nspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled." *Id.* § 1225(b)(1). The duty to inspect aliens thus applies beyond the context of arrival. As the Ninth Circuit has explained, the language of section 1225 belies a distinction "between aliens at ports-of-entry and those encountered elsewhere in the United States," *United States v. Gambino-Ruiz*, 91 F.4th 981, 986 n.3 (9th Cir. 2024), and "a single inspection procedure applies to 'aliens arriving in the United States and certain other aliens who have not been admitted or paroled,'" *id.* at 988 n.5 (emphasis omitted) (quoting 8 U.S.C. § 1225(b)(1)).

The duty for aliens to submit to inspection likewise is continuing. An alien who refuses to submit to the inspections required by section 1225 is subject to various consequences. Some are civil. *See, e.g.*, 8 U.S.C. § 1182(a)(6)(A)(i) (making such aliens "inadmissible"); *id.* § 1227(a)(1) ("inadmissible" aliens are "deportable" aliens who "shall . . . be removed"). One is criminal, as described in section 1325(a)(2)—any alien who "eludes" the immigration officers' section 1225-mandated inspection faces fines or up to six months in prison. And because section 1225 is clear that the duty to inspect is ongoing, so is the duty to submit to inspection. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023) ("Basic principles of statutory interpretation require" construing statutory provisions "in harmony . . . .").

And this reading would make sense. Immigration officers inspect aliens to determine, among other things, if they are inadmissible or have a credible fear of persecution sufficient to justify further investigation. *See* 8 U.S.C. § 1225(b)(1). That determination must be made for an alien "applicant[] for admission" regardless of where the alien is found or where the immigration officer conducts the inspection. *Id.* § 1225(a)(1), (a)(3), (b)(1)(A)(i). Section 1325(a)(2) sanctions illegal aliens for "elud[ing]"

these inspections. It would make no sense to impose a criminal sanction on an alien who "eludes" that necessary inspection at a port of entry while sparing another alien, whom immigration officials are just as responsible for inspecting, of that same sanction merely because he "eludes" his inspection somewhere else.

An alien might be able to terminate (but not retroactively cure) the continuing offense by fulfilling the statutory duty to submit to an inspection sometime after entry. As we have explained, these inspections generally occur whenever an applicant for admission is apprehended. What is more, immigration regulations currently list *hundreds* of designated Class A port-of-entry facilities throughout the country. *See* 8 C.F.R. § 100.4(a) ("Class A means that the port is a designated Port-of-Entry for all aliens."). Not all of these facilities are at the border. There are designated facilities in Des Moines, Iowa; Omaha, Nebraska; Billings, Montana; Reno, Nevada; Columbus, Ohio; Charleston, West Virginia; and so on. An alien can also withdraw his constructive application for admission under 8 U.S.C. § 1225(a)(4) and 8 C.F.R. § 235.4. To be sure, belatedly fulfilling the statutory duty to submit to inspection—or withdrawing a constructive application for admission—may carry consequences for the alien. But our criminal laws rarely, if ever, allow someone to purge his prior criminal conduct by bringing a continuing offense to an end. *See, e.g.*, *Smith v. United States*, 568 U.S. 106, 111 (2013) ("Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy. Withdrawal also starts the clock running on the time within which the defendant may be prosecuted . . . .").

Our reading of the statute is further confirmed by the fact that section 1325(a)(2) prohibits conduct that would create an ongoing threat to U.S. citizens. The Supreme Court has made clear that a crime is continuing if it is of the sort whose "nature" is "such that Congress must assuredly have intended that it be treated as a continuing one." *Bailey*, 444 U.S. at 413 (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970)); *see, e.g.*, *United States v. Holden*, 806 F.3d 1227, 1231 (9th Cir. 2015). For example, a prisoner who "escapes" prison commits a continuing offense in part because the crime is one that "by its nature" presents a "continuing threat to society," "such that Congress must . . . have intended that it be treated as a continuing one." *Bailey*, 444 U.S. at 413 (analyzing 18 U.S.C. § 751(a)). Evading inspection is much the same. Immigration officials

inspect aliens to discover whether (among other things) those aliens have or will seek to engage in "terrorist activity," "espionage," "sabotage," efforts to "overthrow" the U.S. government by force, the theft of sensitive information or technology, or "any other unlawful activity." *Id.* §§ 1182(a)(3), 1225(c)(1). They also check whether aliens are criminals, traffickers, prostitutes, money launderers, or carriers of a "communicable disease." *Id.* § 1182(a)(1), (2). Such aliens are statutorily inadmissible because their past, present, or planned conduct shows that they would put American communities in harm's way. If they enter the United States illegally and then evade inspection for such attributes in the years that follow, they represent a "continuing" threat to the American people. *Bailey*, 444 U.S. at 413. As the President has proclaimed, "millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide," and remain to this day, because they avoided the process by which the United States vets entering aliens. Presidential Proclamation 10888, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025). It makes sense that Congress would impose a continuing obligation on uninspected aliens to help counter this threat, and it makes sense that Congress would enforce that obligation with a continuing offense that lasts until the alien submits to inspection.[4]

## B.

On top of all this, the constitutional avoidance canon further counsels against interpreting section 1325(a)(2) as a non-continuing offense. The modern version of that canon "is a tool for choosing between competing plausible interpretations of a statutory text." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). It teaches that when one plausible interpretation raises "serious constitutional doubts," Congress likely intended the text to reflect the other plausible interpretation. *Id.* The traditional version of the canon is stricter: "[I]t commanded courts, when faced with two plausible constructions of a statute—one constitutional and the other unconstitutional—to choose the constitutional reading." *Id.* at 395 (Thomas, J.,

---

[4] We recognize that prosecutors in circuits that have construed section 1325(a)(2) as a non-continuing offense may be bound by circuit precedent not to charge section 1325(a)(2) offenses unless in the district of entry. We leave that decision to the sound discretion of the prosecuting component.

dissenting). As the Court explained in 1838, "a presumption never ought to be indulged, that [C]ongress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the Court by language altogether unambiguous." *United States v. Coombs*, 37 U.S. (12 Pet.) 72, 76 (1838).

As our 1978 analysis shows, interpreting section 1325(a) to describe only non-continuing crimes would run afoul of both versions of this canon because doing so would render the venue provision applicable to section 1325 entirely unconstitutional. Again, section 1329 grants district courts jurisdiction over section 1325 prosecutions. It also describes the proper venue for those charges, permitting such prosecutions "at any place in the United States at which the violation may occur or at which the person charged with a violation under section 1325 or 1326 of this title may be apprehended." 8 U.S.C. § 1329. As our 1978 opinion pointed out, the provision "makes good sense" for a "continuing offense" because it clarifies that the "locality" in which the alien is "apprehended" may serve as a venue for his prosecution. *Eluding Inspection*, 2 Op. O.L.C. at 111. But the provision is entirely "unconstitutional" for section 1325(a) if none of the crimes falling within that subsection are "continuing" because it would allow prosecutors to charge an alien in a venue other than that in which he entered the country and first eluded inspection. *Id.* at 110–13; U.S. Const. amend. VI (defendants have a right to trial "by an impartial jury of the State and district wherein the crime shall have been committed"); *id.* art. III, § 2, cl. 3 (trials must be "held in the State where the said Crimes shall have been committed"). Thus, in either its modern or traditional form, the avoidance canon counsels that Congress did not intend for section 1325(a)(2)—the section 1325(a) crime most likely to be a continuing offense—to be interpreted as a non-continuing offense such that the part of section 1329 governing section 1325 is unconstitutional.

We note that *United States v. Davis*, 588 U.S. 445 (2019), could be read to cast doubt on our application of the avoidance canon. In *Davis*, a five-Justice majority expressed "doubt" that the avoidance canon can be used "to *expand* the reach of a criminal statute in order to save it." *Id.* at 463. The Court's skepticism reflected the fact that the government's expansive interpretation of the statute there would subject criminals to "additional punishment" for conduct that the penalty provisions had "not previously been understood to reach." *Id.* at 463–64. This, the Court suggested,

would "sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *Id.* at 464.

We are therefore cautious not to place too much weight on the avoidance canon. But in the end, *Davis* does not change our independent view that the canon favors our interpretation under these circumstances. To start, *Davis*'s lenity rationale is not readily applicable to our construction of section 1325(a)(2). That is because "the rule of lenity is typically invoked only when interpreting the substantive scope of a criminal statute or the severity of penalties that attach to a conviction—not the venue for prosecuting the offense." *United States v. Canal Barge Co.*, 631 F.3d 347, 353 (6th Cir. 2011). Unlike in *Davis*, our reading would not subject those who elude inspection to "additional punishment" for conduct that the statute had "not previously been understood to reach." 588 U.S. at 463, 464. Instead, the same offense that someone might commit at the border—eluding inspection—simply continues, such that venue is proper in districts other than those at the border. Nor does our reading subject those who elude inspection to greater punishment. And in any event, as the Court has repeatedly reiterated since *Davis*, the rule of lenity "applies only if after seizing everything from which aid can be derived"—such as substantive canons like constitutional avoidance—"there remains grievous ambiguity." *Pugin v. Garland*, 599 U.S. 600, 610 (2023) (internal quotation marks and citation omitted); *see, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 152–53 (2024) (declining to apply the rule of lenity because the traditional tools of statutory interpretation reduced "two grammatically permissible readings of the statute" to "one"); *Brown v. United States*, 602 U.S. 101, 122 (2024). Because the avoidance canon helps confirm our semantic reading of the statute, there is no sound basis for turning to the rule of lenity.

## C.

Of course, there are counterarguments against our interpretation. And while certain of those counterarguments have appeal, none convinces us that section 1325(a)(2) describes a non-continuing offense.

One counterargument is structural. Section 1325(a)(2)'s neighbor, section 1326(a)(2), created a continuing offense by subjecting to criminal liability any alien "found" in the country after having been denied entry

before. And it is true that, "'[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). Here, the argument would go, Congress purposely made section 1326(a)(2) a continuing offense by criminalizing being "found" in the United States after reentry while not doing so for criminal entry under section 1325(a), suggesting that Congress did not intend illegal entry to be a continuing offense.

"The force of any negative implication," however, "depends on context." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (internal quotation marks and citation omitted). Here, "[s]tatutory history is an important part of this context," *United States v. Hansen*, 599 U.S. 762, 775 (2023), and it shows that the negative implication runs in the other direction. In the early twentieth century, aliens were to be deported if they entered "at any time or place other than as designated by immigration officials" or "enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The Act also required the deportation of any alien who, "within five years after entry," was "found in violation of this Act, or in violation of any other law of the United States." *Id.* In 1929, however, Congress revised the "enter without inspection" language to "elude[] examination or inspection by immigration officials." Act of Mar. 4, 1929, Pub. L. No. 70-1018, § 2, 45 Stat. 1551, 1551. (Congress also subjected aliens who violated that provision to criminal sanctions.) This statutory history therefore suggests that Congress expanded the scope of the inspection offense beyond the mere point of entry. *See, e.g.*, *Snyder v. United States*, 603 U.S. 1, 12 (2024) (using "statutory history" to "reinforce[]" the Court's "textual analysis"); *Niz-Chavez v. Garland*, 593 U.S. 155, 168 (2021). Congress had no need to use the word "found" in this provision to distinguish the eluding-inspection offense from an offense that occurs only during entry—its deletion of the word "enter" and insertion of the word "elude" did just that.

Moreover, a negative implication "may be displaced by other [statutory] tools" pointing the other way. *Grand Trunk W. R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 825 (6th Cir. 2017). The statutory tools we have applied above show that section 1325(a)(2) creates a continuing crime.

The strongest negative implication to derive from section 1326 is that "entry" is not a continuing offense, or else Congress would not have needed to use the word "found" in section 1326. But it does not follow that none of the offenses described in section 1325(a) are continuing, especially because the verb "eludes" is best understood to create an ongoing offense. And the negative implication could cut the other way. If Congress uses "entry" to connote a non-continuing offense, it could have said that "elud[ing] examination or inspection by immigration officers *upon entry*" would be a criminal offense. That Congress did not cabin section 1325(a)(2) to entry, when the other two provisions of section 1325(a) refer explicitly to entering the United States, could support an interpretation of the eluding-inspection offense as continuing. So, although the negative-implication canon might offer some support for the notion that section 1325(a)(2) is not a continuing offense, "this principle . . . can be employed as easily to support the opposite interpretation." *Blumberger v. Tilley*, 115 F.4th 1113, 1138 (9th Cir. 2024) (citation omitted).

Furthermore, the broader statutory context could just as well indicate congressional intent to establish section 1325(a)(2) as a continuing offense. Specifically, section 1326(a) is far from the only continuing offense found in nearby sections of title 8 of the United States Code. For example, section 1324a(a)(2) makes it a crime to "continue to employ" an alien. And section 1324(a)(1)(A)(iii) makes it a crime to "harbor[], or shield[] from detection" an unauthorized alien. These provisions, which both precede and follow section 1325, are continuing in nature and suggest that Congress believes that immigration crimes are generally of a "continuing" "nature," unless Congress uses clear language to the contrary. *Bailey*, 444 U.S. at 413. Such examples also undermine the notion that Congress implicitly meant to render section 1325 a non-continuing offense, simply by using the word "found" in section 1326.

Case law could also lend some support for interpreting section 1325(a)(2) as non-continuing, but the most relevant precedents provide only thin reeds on which to hang such an interpretation. In 1958, the Supreme Court said that, because "'entry' is limited to a particular locality and hardly suggests continuity," section 1325(a) is "not continuing." *United States v. Cores*, 356 U.S. 405, 408 n.6 (1958). But that statement was dicta, and the Supreme Court has since opined that a statute's use of a

verb that might in some contexts describe a discrete act can nevertheless count as a continuing offense. *See Bailey*, 444 U.S. at 413 (holding that a statute penalizing "escape" from federal custody creates a continuing offense (citing 18 U.S.C. § 751(a))); *see also United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 (1999) (noting that excessive focus on the verb alone "unduly limits the inquiry into the nature of the offense"). Besides, the Supreme Court did not specifically address section 1325(a)(2)'s eluding-inspection offense, just section 1325(a)(1)'s unauthorized-entry offense. *Cores*, 356 U.S. at 408 n.6. And while some lower courts have continued to hold that section 1325(a)'s crimes are non-continuing, *see, e.g.*, *Rincon-Jimenez*, 595 F.2d at 1193–94; *United States v. Pruitt*, 719 F.2d 975, 978 (9th Cir. 1983); *Cavillo-Rojas*, 510 F. App'x at 248–49, many have yet to decide one way or the other.

Finally, we acknowledge the Supreme Court's admonishment that "the doctrine of continuing offenses should be applied in only limited circumstances" because such offenses extend the statute of limitations. *Toussie*, 397 U.S. at 115. But it is unclear whether that presumption applies here because "the 'continuing offense' analysis for venue purposes is 'obviously different' from the 'continuing offense' analysis for statute of limitations." *United States v. Reitmeyer*, 356 F.3d 1313, 1323 (10th Cir. 2004) (citation omitted); *see also id.* ("An offense may begin, continue, or end in different locations without qualifying as a 'continuing offense' for statute of limitations purposes." (citation omitted)). *Toussie*'s rule is born of the consequences of extending the statute of limitations. As the Court explained, "a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie*, 397 U.S. at 114–15. Because construing an offense as continuing for statute of limitations purposes can bypass these protections, the Court applied a presumption against such a construction. But the situation is different when an offense is construed as continuing for venue purposes. Venue is relevant only to where a defendant may be charged—not when. *Toussie* itself emphasized this difference, distinguishing "other instances in which th[e] Court has held that a particular statute describes a continuing offense" as "cases deal[ing] with venue" and "not involv[ing] the statute of limitations." *Id.* at 120–21 & n.16. And in subsequent cases, the Court has not

applied the *Toussie* presumption to continuing-offense cases about venue. *See, e.g.*, *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281–82 (1999).

On this point, *United States v. Canal Barge Co.* is instructive. 631 F.3d 347 (6th Cir. 2011). There, the Sixth Circuit considered whether a regulatory crime was a continuing offense for venue purposes. *Id.* at 351–52. The court found *Toussie* and its progeny "distinguishable" from the case before it "because they involve statutes of limitations, not questions of venue." *Id.* at 353. The court explained that "[a] crime can be both complete" for statute of limitations purposes "and continuing for venue purposes." *Id.* at 352. It acknowledged that "questions of venue, like statutes of limitations, involve a temporal element." *Id.* at 353. But the court nevertheless found "the distinction . . . sensible in light of the different consequences that attach to a determination that a crime is a continuing offense for statute of limitations purposes as opposed to venue purposes." *Id.* If a crime is continuing for venue purposes only, then "the defendant is merely exposed to prosecution in a different district." *Id.* But should the crime be continuing "for statute of limitations purposes, the defendant may be prosecuted after a time at which he would otherwise have no exposure whatsoever." *Id.* The "serious consequences" that result from the latter scenario justified a presumption against interpreting a crime as continuing, in a way that the less-serious consequences of the former scenario did not. *Id.* In reaching this conclusion, the Sixth Circuit noted that *Toussie* "specifically distinguished . . . cases that dealt with venue and did not involve the statute of limitations." *Id.* (citing *Toussie*, 397 U.S. at 121).

We recognize that this distinction is no silver bullet. Although some courts have held that "[a]n offense may begin, continue, or end in different locations without qualifying as a 'continuing offense' for statute of limitations purposes," *Reitmeyer*, 356 F.3d at 1323 (citation omitted), others have held that the statute of limitations for a continuing offense "does not begin to run when all elements are first present, but rather begins when the offense expires," *United States v. Yashar*, 166 F.3d 873, 875–76 (7th Cir. 1999). So, in some circuits, an offense might "continue" for venue purposes while also being "complete" and triggering the statute of limitations. In other circuits, an offense that continues for venue purposes does not start the statute of limitations until it is complete and no

longer ongoing. *See, e.g.*, *United States v. Hernandez*, 189 F.3d 785, 790 (9th Cir. 1999) ("By articulating the act that triggers *when* a § 1326 violation is committed—the alien's discovery by the immigration authorities—these cases also provide a limit on *where* venue may lie."); *cf. Clark*, 543 U.S. at 380 ("It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation.").

In all events, the *Toussie* presumption does not apply when "the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." 397 U.S. at 115; *see, e.g.*, *United States v. Pontz*, 132 F.4th 10, 25 (1st Cir. 2025) (either "statutory language" or "congressional intent" can overcome the presumption); *Bailey*, 444 U.S. at 413. Conspiracy, for instance, is a continuing offense, even though its elements can be satisfied at a discrete moment in time. *See Pontz*, 132 F.4th at 25. And as explained above, both the language and nature of section 1325(a)(2) support the continuing-offense interpretation.

### D.

Our independent and faithful interpretation of section 1325(a)(2) is that the eluding-inspection offense is continuing. But there is an additional, prudential reason to rescind our prior recommendation—namely, that our previous advice foreclosed judicial percolation on this question. As we have recognized, when we remove barriers to litigation imposed by our Office, courts can "provide a one-way check on the correctness" of our opinions in much the same manner that courts check one another as a question works its way through the judiciary. *Wire Act*, 42 Op. O.L.C. at 180. Because such review is often salutary, we are more likely to reconsider or cabin our precedent when doing so "make[s] it more likely that the Executive Branch's view of the law will be tested in the courts." *Id.* at 179–80.

Here, our 1978 opinion has stopped litigation over one of the most common federal charges. The instruction that resulted from it has deprived courts of section 1325(a)(2) cases through which they could address the question. In effect, we self-imposed a nationwide injunction,

thus ending the "airing" of any "competing views" in court. *Dep't Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see also, e.g.*, Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 461 (2017). Courts have had no opportunity to "check on the correctness" of the position that we adopted without analysis and merely by implication from an unpublished District of Idaho decision. By now interpreting section 1325(a)(2) to be a continuing crime and rescinding our prior recommendation, we again open the question up to the courts for review and debate.

## IV.

In 1978, we correctly determined that part of section 1329's venue provision would be unconstitutional if section 1325(a)(2) were not a continuing crime. But we never squarely analyzed—let alone ultimately decided—whether section 1325(a)(2) was in fact a non-continuing offense. We nevertheless recommended that the Criminal Division instruct prosecutors to cease pursuing that prosecution theory. The Criminal Division adopted and eventually expanded that instruction, which now prohibits charging any section 1325(a) crime as a continuing offense.

As set forth above, we now believe that section 1325(a)(2) describes a continuing offense for purposes of venue. We accordingly withdraw our 1978 opinion's recommendation and instead recommend that the Criminal Division remove the instruction from the Department's internal manual so that prosecutors can charge section 1325(a)(2) in appropriate circumstances.

M. SCOTT PROCTOR
*Deputy Assistant Attorney General*
*Office of Legal Counsel*